FREDERICK W. BECK *et al.* v. MICHAEL ALLISON.

A covenant in a lease to repair will, in a proper case, be specifically enforced in. equity. The cases in which the contrary is expressed, shown to have been loosely determined, without due examination of the authorities.

What is to be done under the covenant, however, must be clear, definite, and certain, for if it be extensive, involving too many details, which demand the consideration of the particular circumstances and the exercise of judgment, as well as a long time for its performance, the party will, unless the equities are very strong, be left to his remedy in an action for damages. This branch of equitable jurisdiction is the exercise of a discretion which depends upon the facts and circumstances of each particular case.

If the contract was just and fair when entered into, events afterwards occurring, which are not so involved in it that they must have been in the minds of the parties when the contract was made, cannot be invoked to show the hardship of and to excuse performance, unless they were in some way due to the party who applies for the specific performance. They may be taken into consideration, however, where the court can, instead of decreeing a specific performance, make a more equitable disposition of .the whole matter.

If the plaintiff knew, when he brought his suit, that the defendant could not perform, either from his having conveyed the property to another, or from any other cause, the complaint must be dismissed, the plaintiff's remedy being an action for damages, which is not only an adequate, but his sole remedy; the defendant in that case being entitled as matter of right to a trial by jury.

But where it is averred in the complaint, and appears from the facts set forth in it, that the defendant can and ought to perform, the jurisdiction in equity attaches, the defendant is put to his answer, and the case comes before the court upon the issue and the proofs for its equitable consideration. If it then appear, upon the defendant's showing that he has disabled himself from performing, and in doing so acted inequitably, the court may decree to the plaintiff a compensation in money, to be ascertained by some equitable rule, or by a trial by jury; because the plaintiff, being ignorant when he brought his suit of the defendant's disability, had a right to bring it; and jurisdiction having attached by the institution of a suit justly and properly brought, it may be made effectual for the purpose of administering complete relief.

The cases reviewed relating to the right of a court of equity, where it refuses a specific performance, to amend a compensation in damages; their conflict with each other considered, and the rule deducible from them laid down.

If jurisdiction in equity attaches, as where performance is not impossible, but exceedingly onerous, the court is not bound to decree a specific performance, if it can, by adapting the remedy to the special circumstances of the particular case, make a more equitable adjustment of the whole matter. Thus, where the covenant on the part of the landlord, in a lease of some years' standing, was that he would repair all damages to the building occasioned by a fire, and the building was so damaged by a fire that it could not, under the fire laws, be repaired from the old foundations, and the erection of a new structure became necessary; the court took into consideration that the building was very old, that it was unsuited to the locality where it was, being neither of the style, size, or strength required for the business usually carried on there; that it would—the lease then having but three years more to run—subject the landlord to great loss and injury to compel him, in fulfillment of the covenant, to re-erect such a building as the one destroyed,—the tenant refusing, if a building were erected suitable to the locality, to pay any more rent for the remaining three years than he had previously paid, and insisting upon a strict fulfillment of the covenant,—and, in view of these circumstances, refused to enforce the specific performance of the covenant, but adjudged instead that the landlord should pay to the tenant the estimated excess of the value of the lease to him for the remaining three years over the rent he was to pay, which was ascertained and fixed by the court upon the trial, from evidence before it.

A covenant, as respects its future performance, when the contingency arises which calls for its fulfillment, will be construed with reference to a public law or regulation enacted after the covenant was entered into, if the law or public regulation in any way affects it.

APPEAL by defendant from a judgment entered on the decision of a judge at special term.

The action was brought by the plaintiffs, assignees of a lease of a building owned by the defendant, which had been injured by fire, to compel the specific performance of a covenant in the lease, to repair all damages caused by fire.

The judge who heard the case at special term found that defendant had covenanted to repair it as alleged in the complaint, and had failed to perform, but declared that in the exercise of a sound discretion he should not be adjudged to perform specifically, but that the plaintiffs were entitled to damages for non-performance, which he assessed at $2,366 68, and that the lease held by plaintiffs should be surrendered and canceled. The other facts necessary to an understanding of the case are stated in the opinion.

*Andrew Boardman*, for appellant.

I. It would be highly inexpedient and dangerous for the court to turn builder of houses, make contracts, buy materials, employ and superintend workmen, devise plans and take charge and management of the defendants' affairs, and what it will not appoint a receiver to do, it surely will not authorize the plaintiff to do (*City of London* v. *Nash*, 3 Atk. 512; *Errington* v. *Aynesley*, 2 Bro. Ch. R. 343; *Lucas* v. *Comerford*, 3 Bro. Ch. 167; *Flint* v. *Brandon*, 8 Ves. 163; *Raynor* v. *Stone*, 2 Eden, 128; *Hill* v. *Barclay*, 16 Ves. 405; *Harris* v. *Jones*, 1 Moo. & Rob. 173).

II. There is nothing in the complaint to show that the plaintiffs had not a complete and adequate remedy at law. Equity does not interfere except in case of strong and imperious necessity, or in case where a suit at law would not afford to the plaintiff ample relief (*Olmstead* v. *Loomis*, 6 Barb. 160–165; *Redfield* v. *Middleton*, 7 Bosw. 649; *Van Bergen* v. *Van Bergen*, 3 John. Ch. R. 282; *Reed* v. *Gifford*, 6 Id. 19).

III. The Court having rightly decided that the plaintiff had not the right to the relief he demanded, should have dismissed the complaint with costs. The defendant, when the question

resolved itself into purely one of damages, had the right to a trial by jury.

*W. W. Macfarland,* for respondents.

I. Covenants to improve and repair are among those covenants of which a specific performance will be decreed in proper cases (*Stuyvesant* v. *Mayor of N. Y.,* 11 Paige, 414; Fry on Specific Performance, 66, side p'g 30; *Denton* v. *Stewart,* 1 Cox, 258).

Since the case of *Denton* v. *Stewart* (1 Cox, 258), it has been the constant practice in courts of chancery, both in England and in this country, in *a certain class of cases,* to retain the bill and give damages in cases where a decree for specific performance was denied. Touching the power of a court of equity to decree damages or compensation in cases where specific performance could not be decreed, it is true there has been much controversy. It is equally true that this controversy, particularly in this country, has been confined to the class of cases where, at the time of filing the bill, specific performance had, for some cause, become impossible. So that, in substance, the bill was not a bill for specific performance, that having become impossible, but for damages for the non-performance of a contract, and constituting a plain ground for legal, but not equitable, relief, and, therefore, *no jurisdiction in equity existed at any stage of the cause.*

No serious doubt has ever been expressed or acted upon in any case where the cause came within the jurisdiction of the court; and it became a matter of sound discretion, under established rules, whether the court would decree performance or give damages or performance in part, or damages as to the residue. In short, if jurisdiction attached for any purpose, no question existed as to the power of the court on the question of damages.

The broad doctrine of *Denton* v. *Stewart* was followed by Chancellor Kent in *Phillips* v. *Thompson* (1 John. Ch. 150), and *Parkhurst* v. *Van Cortlandt* (1 John. Ch. 286).

In *Hatch* v. *Cobb* (4 John. Ch. 560), the chancellor takes the distinction referred to, and says, " It is doubtful how far the court has jurisdiction to assess damages merely in such a case, *in which the plaintiff was aware when he filed the bill that the contract could not be specifically performed or decreed.*"

The same view is expressed in *Kempshall* v. *Stone* (5 John. Ch. 194, 195).

In *Woodcock* v. *Bennet* (1 Cowen, 711), the general jurisdiction was affirmed.

The Supreme Court of the United States, in *Pratt* v. *Law* (9 Cranch, 492, 494), exercised this jurisdiction without doubt or hesitation.

The same is true of the Supreme Court of Mass.; *Andrews* v. *Brown* (3 Cush. 134), where the question is very fully discussed.

In England the question has been set at rest by Sir Hugh Cairnes' act, 1858, defining in what cases the court may give relief by way of damages.

But, to conclude, there never was any doubt as to the power of the court in the premises where jurisdiction attached, and they were given in lieu of specific performance or other equitable relief, or as incidental to and in connection with other relief.

II. In the case at bar, the court clearly had power to grant a specific performance. Moreover, the court having decided not to grant a decree for specific performance, the tenancy was at an end before the expiration of the term of the lease, and a disposition of the whole matter in controversy required that the lease should be delivered up and canceled. It was, therefore, necessary for the court to hold the bill for this equitable relief. And as the court never deals with a subject-matter by piecemeal, but, if at all, in such a manner as to settle all questions and put an end to the controversy, it was plainly in accordance with established principles to ascertain and decree the payment of the damages.

The judgment would stand, therefore, independent of the Code.

III. Since the Code, such a question as we have been discussing can hardly arise. Legal and equitable jurisdiction has been concentrated in one and the same tribunal, and all distinctions in the forms of pleading abolished.

The only distinction remaining relates to the *mode of trial*, and the processes of enforcing judgment.

The only distinction applicable to the class of cases under discussion relates to the mode of trial.

And, if we assume that in every case where the court refused to grant the strictly equitable relief prayed for, and yet the case appeared to be a proper one for damages, the court would be bound, on the motion of the defendant, to send down an issue to be tried by the jury, or send the case to the circuit for that purpose; it is, nevertheless, plain that trial by jury may be waived, and is waived by an omission to make this motion and raise this objection, and in such case a trial by the court is lawful and proper.

In the case at bar, for the reasons before stated, it is submitted that no objection to the mode of trial could have been well taken. But, however this may be, no such objection appears in the case, and hence the case is in all respects governed by *Greason* v. *Keteltas* (17 N. Y. 491), and *Barlow* v. *Scott* (24 N. Y. 40).

By the Court.*—DALY, CH. J.—This case was an action for equitable relief, and it is so complicated, both as respects the facts and the questions that arise upon them, that it will be necessary to a clear understanding of the points that we have to pass upon to ascertain from the pleadings the exact nature of the case which the plaintiffs presented in their complaint, and the defense which the defendant set up to it, by his answer.

The plaintiffs set forth that they are the equitable assignees of a lease of a house and lot in Vesey street in this city, which

---

* Present, DALY, Ch. J., LARREMORE and J. F. DALY, JJ.

the defendant in 1864 demised for the term of two years to certain persons, who assigned the lease to one of the plaintiffs, Frederick S. Beck, he subsequently agreeing with the other plaintiffs, who are his partners in business, to hold the lease for his and their benefit; by the provisions of which lease he, Beck, became entitled to a renewal for the further term of three years from the 10th of May, 1866. The lease contained the following clause or covenant: "and all repairs and improvements, including the painting of the front and the roof, and all that they may require to be done to the said premises, damages by fire excepted, are to be repaired by the party of the first part (the lessees), and to pay the said rent of $2,800 each and every of the above mentioned years, &c." The words, "damages by fire excepted," and "to be repaired by the party of the first part," were interlined in the lease, after it had been filled up and before its execution, to give effect to the agreement then made between the defendant and the lessees, that all damages occasioned by the fire should be repaired by the defendant, it having been agreed that the lessees should pay for all other repairs and improvements which they might require.

The plaintiffs, after they came into possession of the premises, expended a large amount of money in making improvements, in erecting an engine house thereupon and in setting up a steam engine to drive the machinery used in their business; and whilst they were thus in possession, a fire occurred on the premises on the 31st of March, 1866, by which the buildings were greatly damaged and injured, so that extensive repairs became necessary to render the premises tenantable and enable the plaintiffs to carry on their business.

The complaint then recites that the plaintiffs repeatedly called upon the defendant to repair the building, which he wholly neglected to do, putting the plaintiffs off with various excuses, and demanded the rent, without disclosing what he intended to do. That the plaintiffs gave him notice that if he did not proceed with the repairs, an action would be commenced against him to authorize the plaintiffs to expend the accruing rent in making the repairs, and to restrain him in the

meanwhile from collecting the rent. That an interview took place in consequence of this notice between the attorneys of the respective parties, the result of which was, as the plaintiffs understood it, that the defendant claimed to be ready to take one of two courses: to repair the damages and reinstate the premises in their former condition, or to put up a different and more expensive building, of which the plaintiffs might take a lease at an enhanced rent, surrendering the existing lease for a sum to be named by them as a compensation for the value of their unexpired term. That they accordingly named the sum and offered to surrender the existing lease, but that no answer was returned by the defendant. That in place thereof, he sent them a note, demanding the payment of the rent up to the 1st of May, 1866, and threatening that if it was not paid, he would take legal measures to dispossess them of the premises for the non-payment of it.

That all that the defendant did after the fire was to employ a few men to take down a part of the walls, which were considered dangerous as they stood. That without indicating what he would do himself under the covenant, he applied to the plaintiffs upon several occasions to know what they would do about the lease, and stated to them that it would be much better for him to take down the building and erect a more modern one in a better style, which would command a better rent, and asked if he did so, if they would be willing to pay a higher rent; but the plaintiffs declined to enter into any such arrangements, and as during two-thirds of the time that had elapsed from the happening of the fire, nothing had been done, and as no materials had been brought to the premises for repairing the building, the plaintiffs, after nearly two months had elapsed from the time of the fire, commenced this suit to compel the defendant to perform his covenant to repair. The equitable relief asked for in the complaint was, that the defendant should be adjudged to perform his covenant; that the plaintiffs might be authorized to expend the rent accruing under the lease in repairing the damages occasioned by the fire; that the defendant might in the meanwhile be restrained from taking any proceed-

ings to enforce the payment of the rent, or to disturb the plaintiffs' possession; and that a receiver should be appointed, to whom the plaintiffs could pay the rent, that it might be applied towards the making of the repairs, and that such repairs should be made under the direction of the receiver, if the defendant neglected to proceed with due diligence to make them; that is, as I infer, if he should not proceed after the court had decreed the specific performance of the contract.

The defendant, in his answer, admits that the provision referred to was incorporated in the lease to relieve the lessees from the obligation they would otherwise be under to repair the premises in case of fire, but claims that the repairs intended to be provided for by this clause were such as might arise from a slight or moderate damage by fire, and not such as are required when a building is so damaged by the fire as to become untenantable; in respect to which, it is sufficient to say, that there is no such distinction in the covenant, nor can it, by any construction, be grafted upon it. If the court should be of the opinion that the covenant is not susceptible of such a construction, then the defendant asks the equitable aid of the court to correct the covenant, so that it may conform to the actual agreement and intention of the parties; but upon this point the judge below has found against him. He finds that the words " damages by fire excepted," interlined in the lease, do, in the connection in which they stand, truly express the agreement of the parties, and that no mistake was made in so inserting them. No evidence was given upon the trial by the defendant, of any such agreement or understanding. After he had closed his case, and was entitled only to give evidence in rebuttal, he asked a witness this question: " How came that interlineation in the lease?" to which the plaintiffs objected, as presenting the case in a new aspect, and the judge excluded any further testimony on this point, which, in that stage of the case, was a matter of discretion on the part of the judge, which is not reviewable.

The answer of the defendant further avers that there has been no want of diligence on his part; that the state of the

adjoining and party wall, and the measures necessary in respect
to it, and in shoring up the walls befọre they could be taken
down with safety, caused a delay, which was increased by the
plaintiffs' employing the defendant's workmen to get their iron
safe from out of the ruins; that no materials were brought to
repair the building, as they would have impeded the other
operations; that from the time of the fire, he proceeded in
good faith and with due diligence to repair the building.   He
denies any intention of delaying the restoration of the building,
or any purpose of keeping up a show of intending to repair, or
of wearying out the plaintiffs; but avers that, on the contrary,
he used diligence, and did all that it was possible for him to do
to restore the building.  He avers that the plaintiffs never
notified him to repair until May 7th, which was about two
weeks before the bringing of the suit; that on the 3d of May
he called upon the plaintiffs to pay the rent up to the 1st of
May, and that they replied that they would not pay any rent
for the premises beyond the time of the fire; that he then
offered to accept the proportionate part of the rent up to the
time of the fire, in full of the plaintiffs' liability, if they would
cancel the lease, which they refused, and he claims that their
refusal to pay any rent accruing after the fire was an election
on their part to exercise their right, under the statute, to can-
cel the lease, and give up the premises, the premises being
untenantable after the fire; that he offered to sell them the
premises at a price proposed by him, which they took time to
consider, and in a few days afterwards declined to purchase;
that he then offered to put up a larger building, giving them
increased accommodation, which they wanted, if they would
pay a larger rent, and that they took this proposal into con-
sideration, and promised to advise him of their decision, but
never did so; that a person applied to him for a lease of the
premises, provided he erected a new building, the applicant
stating that perhaps the defendant could buy the plaintiffs out;
that his counsel had an interview, in consequence of this appli-
cation, with the plaintiffs' counsel, and that he received from
the plaintiffs' counsel an offer on the plaintiffs' part to sell out

for $5,000, which the defendant considered unconscionable, and as a proof that the plaintiffs were not acting fairly, but were bent upon making the most of the embarrassing circumstances in which the defendant was placed. He admits that the letter received by the plaintiffs demanding rent, and threatening proceedings if not paid, was sent by him, which he did, he says, upon being advised that a written demand of the rent was necessary after the plaintiffs' assumption of the continuance of the tenancy, and he avers that the note requesting the names of the members of plaintiffs' firm (which had reference to his alleged threat to dispossess the plaintiffs) was not written by the direction or knowledge of the defendant's counsel, but by a clerk in the counsel's office ; the answer closing with a general denial of everything in the plaintiffs' complaint not specifically admitted.

Assuming, as we must from the judges' finding and the evidence, that the defendant was bound by the covenant to repair the building after the fire and to put it in a tenantable condition ; the further issues tendered by the defendant's answer, with the evidence under them, and the finding of the court, I shall now proceed to consider. They may be summarily stated as follows : 1. That the refusal of the plaintiffs to pay rent for the time beyond the fire, was on their part an election under the statute of 1860 to quit and surrender the premises (4 Edm. Rev. Stat. p. 433). 2. That the plaintiffs did not notify the defendant to repair until the 7th of May, thirty-seven days after the fire. 3. That the delay was owing to the necessary propping up of the walls after the fire, their condition being such as to make it dangerous without this to work upon the premises ; to the employment by the plaintiffs of the defendant's workmen to get out their safe, and to the negotiation between the plaintiffs and the defendant in respect to the purchase by the plaintiffs of the premises on the putting up of a larger and different structure at an enhanced rent; all of which may be embraced under the general averment in the answer, that the defendant after the fire proceeded in good faith and with due diligence to repair, and did all that it was possible for him to do to restore the building.

Beck v. Allison.

The judge has found that the plaintiffs did not refuse to pay rent for the time after the fire, except upon the ground of the defendant's neglect to proceed with the repairs, and of their right to retain the rent towards indemnifying them for the damage they suffered by the delay. This finding is fully sustained by the evidence. When Beck gave the defendant a check for the rent up to the time of the fire, the defendant said, "Then you surrender the premises," and Beck answered, "No, I do not." The defendant then said, "I want more unless you surrender the building." Beck replied that he would not do any such thing, that at that time he would not pay any more, because the defendant had not been doing anything towards the repair of the building; that he had not done a thing, nor turned a stone towards repairing it. This was on the 3d of May. On the 5th of May the defendant called again, and demanded the quarter's rent, to which Beck answered that he would not give him any more than he had previously offered. The defendant then asked him if he refused to pay the rent, and Beck answered, "Yes, at present I do, until I see what you are going to do." The defendant then took the check for the rent up to the time of the fire, and as he was leaving, Beck asked "what he was going to do," and the defendant answered, that he was "going to repair." This evidence fully warrants the judge's finding, and entirely disposes of this ground of defense.

In respect to the averment that the plaintiffs did not notify the defendant to repair until the 7th of May, the testimony of the plaintiff Beck was, that he had an interview with the defendant three or four days after the fire, and told him that he was very anxious that the building should be put up as soon as possible. That upon another occasion the defendant told him that he would like to put up another building, and that Beck replied that was of no consequence to the plaintiffs, that all he wanted was to get the building put up as it was. That he saw the defendant five or six times, and that the substance of their conversation was all about the repair of the building; that he urged the defendant to go ahead at once, and that the substance of the defendant's replies was, that he wanted to see his brother

(his brother being the owner of the adjoining building, which was also greatly damaged by the same fire); that he could not bring things together; that he was contracting to see what the amount would be, and what the new store would cost; what the difference was between the price of one contractor and the price of another, and stated that there was a difference of $2,500 between the price of one contractor and the price of another; that the impressions he conveyed in these conversations was, that he was "going ahead to do something with the building, and the reason it had not been done was, that he had been delayed for various reasons;" evidence which wholly disproved the defendant's alleged want of notice until the 7th of May, and fully sustained the plaintiffs' averments.

The judge found that the defendant did not proceed with due diligence after the fire in making the repairs, and was not proceeding with due diligence when the action was brought, and this finding is supported by the evidence. It is manifest from the perusal of the testimony, that the defendant had not determined when the suit was brought what he intended to do; whether he would restore the building to the condition in which it was, as far as the fire laws would allow him to do so, or put up a new structure; or if he had, he kept his intention to himself. The building upon the adjoining lot, which was connected with his own by a party wall, belonged to his brother, and the party wall was so damaged by the fire that a part of it was dangerous and had to be shored up to enable the workmen to take it down. Between four and eight days after the fire, his brother informed him that he intended to put up a good substantial store upon his own lot; that he intended to build it as soon as he could, that he was going to build it in the modern style and to make it as substantial as he could. The architect testified, that in the erection of the building of the defendant's brother, they could not take the party wall down separately on the defendant's brother's lot, but that the whole had to come down together; that the wall was taken down as soon as it could be done prudently and carefully; that on the 10th of May he asked the defendant's permission to build a new party wall, notifying him that if he did not

comply it would be pulled down, and that he gave his consent.

What the defendant manifestly wanted was to get rid of the obligation of complying with the covenants in the lease if he could. He therefore wanted the plaintiffs to purchase the premises. The plaintiff Beck's account of what occurred upon that subject is very different from the defendant's testimony, or from what was set up in the defendant's answer. Beck says that the defendant told him that he did not know what to do ; that he would like to sell the premises, as he was building in the country, and asked him to purchase ; that he told the defendant that the plaintiffs were not in a condition to purchase ; that he, Beck, had property in Baltimore, and that all the money the plaintiffs had was locked up in it ; that it was a matter he could not decide alone ; that he would see his partners, but that he, Beck, had no idea of purchasing. A week after the fire the defendant spoke to Beck about putting up a larger building. Either upon that or some other occasion, he talked about putting up a different kind of building, but that it would require the payment of more rent, and the plaintiffs told him that all they wanted was to have the building put back in its original state, but as to paying more rent, they could not think of that. In this respect there is a conflict between the defendant's and Beck's testimony ; but upon the judge's finding, we must assume that where they differed as they did in this instance, he gave greater weight to Beck's testimony.

That the defendant was anxious to get rid of the lease, appears from his own testimony. He says that when Beck replied that the amount offered was the rent up to the time of the fire, he, the defendant, said, " Then you cancel your lease, and I accept it ; " and that when Beck said " No," the defendant laid the check for the amount offered down, and said he would not accept it on any other conditions. He testified that he never made any written contract with anybody for restoring the building to the condition in which it was before the fire ; that he procured specifications of the work to be done for restoring it to its original condition, but never made any contract for any material for restoring it, and did not purchase

any, and his inaction in this respect extended from the time of the fire to the commencement of the suit, a period of nearly two months. Finally, the letters which passed between the plaintiffs' and the defendant's counsel on the 5th and 8th of May show that the delay was intentional; that, as the plaintiffs aver in their complaint, the defendant's "aim and object was to keep up a show of intending to make the repairs;" the taking down of the party wall and the front wall having become necessary in consequence of his brother's determination to build a new and higher structure on his lot, whilst the clearing up of the ruins, and the cleaning of the old brick, which, with the previous temporary shoring, was all that was done in addition, was essential, whether he should finally determine to erect a new and larger structure, like his brother's, or restore the building, under the covenant, to the condition in which it was, as far as the existing fire laws would permit. Though he said, when he accepted, on the fifth of May, the rent up to the time of the fire, that he was "going to repair," it is, I think, evident from all that previously took place, and from this correspondence, that he had not in fact determined to repair under the covenant, and meant, as before suggested, to get rid of the obligation, in some way, if he could. The letter of the plaintiffs' attorneys of the 5th of May to the defendant, after stating that the premises were damaged by fire so as to require extensive repairs, says, "Although frequently applied to for that purpose, you have not commenced the same, as you are bound to do by your lease; but you nevertheless have demanded payment of the rent up to the 1st inst.," and then advises him that in case of his continued omission to proceed with the repairs, an action will be commenced against him for the purpose of obtaining a judgment, authorizing the plaintiff to expend the accruing rents in the repairs, and for an injunction to restrain him from interfering with their possession, or collecting the rents in the meanwhile. To the letter the defendant's attorneys replied on the 7th of May following. They say that they are instructed by the defendant to state that the plaintiffs have not at any time applied to him to repair, but that, nevertheless, he is proceeding with diligence

to make the repairs, although *the duty of making them, by the* *terms of the lease, devolves upon the plaintiffs ;* and after stating what the defendant had done after the fire, and the cause of the delay that had occurred, the letter adds, " We beg to call your attention to the fact that your clients (the plaint-- iffs) refuse to pay rent for the premises, yet decline to surrender them. We suppose that you cannot both hold the premises, and refuse to pay rent for them ; " and ends with a suggestion of coming to an arrangement which would do justice to all parties. This letter takes the ground that the obligation to repair the premises was upon the plaintiffs, and not upon the defendant, and that it was incumbent upon them either to pay the rent, or surrender the premises, showing unmistakably what the defendant's position then was ; and this state of things continued down to the commencement of the suit. As I have said, the whole of this evidence fully sustains the judge's finding.

Before the plaintiffs called their witnesses, the defendant moved to dismiss the complaint upon the ground that it did not state facts sufficient to constitute a cause of action. Beyond this, the specific grounds of this objection do not appear in the case as settled ; but upon the argument of this appeal, we are referred to the cases of *Errington* v. *Aynesly* (2 Bro. Ch. R. 343 ; 2 Dick. 692) ; *Lucas* v. *Comerford* (3 Bro. Ch. 166 ; 1 Ves. J. 235) ; *Raynor* v. *Stone* (8 Eden, 128) ; *Flint* v. *Brandon* (8 Ves. 163) ; and *Hill* v. *Barclay* (16 Ves. 405), as authorities for the propo- sition that a court of equity cannot and will not decree the specific performance of a contract to repair. In the first of these cases the plaintiff relied upon evidence on his part to show that a bridge could have been built on the foundation that would have stood, and insisted that if he had filed a bill for the purpose, he could, in equity, have compelled the plaint- iff to execute the contract. To this, Lord Kenyon, Master of the Rolls, said, that he never knew a bill for the specific per- formance of a contract of that sort ; that there was no case in which the specific performance was decreed of an agreement to build a house, in which, as will hereafter be shown, he was mistaken. He accordingly relieved against the bond, and directed an issue *quantum damnificatus.*

In the next case, *Lucas* v. *Comerford*, Lord Thurlow was asked to decree the specific performance of a covenant in a lease to rebuild.   He refused to do so.   The plaintiff cited *The City of London* v. *Nash* (1 Ves. Sr. 12), in which Lord Hardwicke held that a contract to build a house might be enforced in equity, but Lord Thurlow replied that he was not inclined to follow that precedent of building a house under the direction of the court, any more than of repairing one.   If the point rested upon the weight of Lord Thurlow's opinion, as opposed to that of Lord Hardwicke, who was not only a great common-law lawyer, but the ablest equity judge that ever sat in the Court of Chancery, there could be little question as to whether he should be followed, or Thurlow, whose general habit was to decide causes off-hand, without examining authorities—a chancellor, who, in the language of Lord Campbell, "dealt recklessly with the rights he had to determine, and who did little in settling controverted questions or establishing general principles."—Lives of the Chancellors, vol. 5, p. 521.

But it is not necessary to rest upon the authority of Lord Hardwicke, for the jurisdiction in equity, to compel the specific performance of a contract to build or repair, was recognized at a very early period.   In an anonymous case in the Year Books, 8 Edw. IV, 4, Genny is put down as saying, "If I promise to build you a house, and I do not do it, you have your remedy by a subpœna in chancery," to which Stillington, the Lord Chancellor, assented.   In a later case, 27 Hen. VII, 41, Fineux, Chief Justice, said, "If a man covenants to build a house for me by a certain day, and does not do it by that day, I shall have my action on the case for the nonfeasance; and so if he does it ill, I may sue him for damages;" which, says the report, he held to be the law.   The report then proceeds, "If a man makes a bargain with me that I shall have his land to me and my heirs for £20, and that he will convey it to me if I pay him the £20, and he will not convey it according to the covenant, I have an action on the case, and need not sue out a subpœna (in chancery)."   This case has been supposed to be authority for the proposition that the only remedy for the breach of an agreement to build, or to convey land, is by an

action at law for the recovery of damages; for at an early period the chancellor used to send for the judges to know when equity should, and when it should not, be admitted against the common law (*per* Doddrige and Chamberlaine, in *Hudson* v. *Middleton*, 2 Rolls R. 433); and that the action at law ought to be the only remedy was the opinion of some of the judges in *Bromage* v. *Germing* (1 Rolls R. 368); but they admitted that the jurisdiction was exercised in the Court of Chancery; but prohibited an inferior court from resorting to it, and in *Molineaux Case* (Latch, 172), it was urged that it was the ordinary course, in a court of equity; and Jones, J., said, though it be so in the Court of Chancery, yet it shall not be suffered in the Court of Requests. I suppose the true interpretation of this case, from the Year Books (21 Hen. VII, 41), to be, that the plaintiff need not sue in chancery, as he may resort to his action at law to recover damages; not that he cannot, in such a case, apply in equity for the specific performance of the contract; for the jurisdiction in equity, to compel the specific performance of agreements, was long before this recognized and acted upon (Cal. ii, 2 temp. Rich. II ; *Scales* v. *Felbrigge* (Ibid. pp. 26, 27), temp. Hen. VI; Year Books (5 Edw. IV, 14) ; 7 Ibid. 14; 8 Ibid. 4; 11 Ibid. 8; 21 Ibid. 23; 11 Hen. IV, 33 ; 37 Hen. VI, 6, 36; 10 Hen. VII, 4, 5; Fitzherbert's Abridgement, Subpœna, 19; Brooke's Abridgement, Conscience, 14, 25; Choyce Cases in Chancery (*King* v. *Raydon*), 43; *Wood* v. *Tirrell*, Cary R. 84; *Pope* v. *Mason ; Bates* v. *Heard ;* and *Throckmorton* v. *Throckmorton ;* Tothill R. pp. 3, 4; Doctor and Student, 2 Dialogue, c. 21).

That the construction I have put upon this case is the correct one, will appear from the fact that Brooke, when incorporating it in his abridgment, was careful to add: "But by this remedy he would get nothing but damages; but by subpœna the chancellor could compel him to convey the estate, or imprison him, as it is said " (Brooke's Abr. Action·Sur le Case, 72).

In *Wood* v. *Tirrell* (Cary R. 84, 19 Eliz.), the landlord covenanted with the tenant to build and repair a house by a certain day, and declared that he was prepared to do it, but that

the tenant would not let him, in order to cause him to break his covenant, and to free himself from his own covenant to keep the building in repair. The defendant demurred, upon the ground that the plaintiff had his remedy at law; but the court overruled the demurrer and put the defendant to his answer. Spence refers to a case (*Kempe* v. *Fitche*, 7 and 8 Eliz. fol. 340) where an injunction was issued to enforce performance and viewers appointed to see to the proper completion of the work (1 Eq. Jur. 647). In *Holt* v. *Holt* (2 Vern. 322), a bill was filed by the heir to compel the administratrix to specially perform an agreement of the intestate to build a house, and performance was decreed. In *Allen* v. *Harding* (2 Eq. Ab. 17), the bill was to compel a curate to perform an agreement made with the plaintiff to build a house upon the glebe land. It was objected that the contract was too uncertain, as it did not mention when it was to be erected, or what kind of a house was to be built, and that the only remedy therefor was an action for damages. Lord Chancellor Cowper, however, said that the contract was for the benefit of the church, and that if it could be performed it ought to be, and he accordingly decreed that a convenient house should be built, and that each side should appoint two commissioners, and if they could not agree, that resort should be had to the ordinary of the diocese.

In the case before Lord Hardwicke (*City of London* v. *Nash*, *supra*), the defendant insisted that the plaintiffs ought to be left to their action at law, upon which Lord Hardwicke said: "The objection will not hold, for upon a covenant to build, the plaintiffs are clearly entitled to come into this court for a specific performance; otherwise on a covenant to repair; for to build is one entire single thing." In *Pembroke* v. *Thorpe* (3 Swans. 437, note), a part of the relief asked was to compel the defendant to perform an oral agreement to pull down an old house and build as good a one in its place. The same objection was taken that the plaintiff had his remedy at law by an action to recover damages for the breach of his agreement. But Lord Hardwicke said: "This court only compels him to perform his own agreement, which he entered into for a valuable consideration, and it would be suffering him to take advantage of his

own wrong if he were not compelled;" and a part of the decree was that the defendant should build a new house. Again, in *Rook* v. *Worth* (1 Ves. Sr.), Lord Hardwicke recognized the right of a court of equity to compel what was asked for in the present action—the rebuilding of a house destroyed by fire. He said that if the tenant in tail mixed the money with his other personal estate, without appropriation to the purpose of rebuilding, that the issue in tail might come into a court of equity to have it so applied; and that if a house destroyed by fire was insured, and the tenant in tail died before the insurance money was paid, the issue in tail would have a right to apply in equity to have the premises destroyed repaired or rebuilt; or that where a tenant in fee had contracted to build a house and died, a court of equity would, as between the executor and the heir, decree that the agreement be carried into execution.

In *Mosely* v. *Virgin* (3 Ves. Sr.), the bill was to compel the performance of an agreement to lay out a certain sum of money in building, and the conflicting decisions of Lords Hardwicke, Kenyon, and Thurlow were cited by the respective counsel. Lord Roslyn referred to the case I have cited from the Equity Cases Abridged (*Allen* v. *Harding*), respecting the building of a house upon the glebe land, as unsatisfactory, being a loose note from a book of reports, most of the cases in which, he said, were inaccurate; and in respect to Lord Thurlow's decision, that contracts to build were too uncertain to be enforced in equity, he made this very proper distinction: "If the transaction and agreement is in its nature defined, perhaps there would not be much difficulty to decree specific performance; but if it is loose and undefined, and it is not expressed distinctly what the building is, so that the court could describe it as a subject for the report of the master, the jurisdiction could not apply;" and this distinction has been approved by the Court of Appeals in this State in *Lobdell* v. *Lobdell* (36 N. Y. 330), the judge who delivered the opinion of the court declaring that specific performance of contracts will not be enforced unless the contract is clear, definite, and certain; for if it be uncertain, so that the court cannot say what its precise import or limitations are, specific performance will be withheld. It is in accordance

with this view that it has been held, both in this country and in England, that the specific performance of a contract to build a railroad will not be enforced in equity, such a work being too extensive in its character, involving too many details demanding the exercise of judgment and the consideration of the particular circumstances, as well as requiring too long a time for its performance, to be conducted under the orders and decrees of a court of equity (*South Wales Railway* v. *Wythes*, 5 De Gex M. & G. 880; *Heathcote* v. *North Stafford Railway Co.* 20 L. J. N. S. 82; *Ross* v. *Union Pacific Railroad*, 1 Woolw. 26, 36; *Fallon* v. *Railroad Co.* 1 Dillon, 121); and yet, where the equities were very strong, a railway company was compelled to build a branch road and make and maintain a wharf ( *Wilson* v. *Furness Railway Co.* E. L. R. 9 Equity Cases, 28). "Rather," said Vice-Chancellor James, in the case last cited, "than allow such a gross piece of dishonesty to go unredressed, the court would struggle with any amount of difficulties in order to perform the agreement." In fact, as Lord Justice Turner said in the first case above quoted, "the interference of a court of equity is the exercise of a discretion, and depends in all cases upon the facts and circumstances of each case." The specific performance or rescission of contracts is not a matter of absolute right in either party. It is matter of sound discretion in the court, to be exercised according to what, under all the circumstances of the case, may appear to be just and right (*Humbard* v. *Humbard*, 3 Head, 100; *Fish* v. *Lightner*, 44 Mo. 268).

In *Rayner* v. *Stone* (2 Eden. 128), Lord Northington refused to enforce specific performance of the covenant of a landlord in a lease to make repairs, but it was upon the ground of the difficulty and uncertainty of knowing and determining on the part of the court what was to be done. "How," he said, "can a master judge of repairs in husbandry? What is a proper ditch in one place may not be so in another; * * besides, how can a specific performance of things of this kind be decreed?" what the covenant enumerated being the repairing of hedges and ditches, the manor house and other buildings, and the setting up of land-marks, stones and fences; and an analogous decision was made by Lord Eldon in *Hill* v. *Barclay* (16 Ves. 404). In

*Flint* v. *Brandon* (8 Ves. 159), Sir William Grant refused to enforce specific performance of a covenant to put a gravel pit in the same state and condition that it was in before the granting of the lease. He refused upon the ground that the landlord had a complete and more perfect remedy at law. The matter he said was only what it would cost to put the ground in the condition which by the covenant it ought to be. That the landlord could recover damages for the breach of the covenant; and recovering and having the disposition of the money, he might perform the work in such manner as he thought proper; whereas, if specific performance were decreed, a question might arise, if the work were sufficiently done. In *Lane* v. *Newdigate* (10 Ves. 193), Lord Eldon declined to decree the specific performance of a covenant to keep the banks of a canal, the stop gates and other works in repair, but accomplished the same purpose by enjoining the defendant from using the canal until he did the repairs. In *Franklyn* v. *Tuton* (5 Mad. 469), Sir John Leach compelled the defendant to alter the elevation of a building which had been erected in contravention of a covenant. In *Storer* v. *Great Western Railway* (2 Y. & Cal. ch. 48), the court compelled a railway company to perform an agreement to make and maintain an archway through their railway, so as to connect the plaintiff's lands, which were severed by the building of the railroad; to be of sufficient capacity to permit the plaintiff's vehicles to pass through the archway; "there is no difficulty," said the vice-chancellor, "in enforcing the decree. The court has to order the thing to be done, and then it is a question capable of solution, whether the order has been obeyed." In *Saunderson* v. *Cockermouth, &c. Railway Co.* (11 Beav. 497), the court enforced a similar agreement, though its terms were more general and it was more difficult to execute; and Chancellor Walworth, in *Stuyvesant* v. *The Mayor, &c. of New York* (11 Paige, 414), compelled the corporation to perform an agreement with the plaintiff to regulate, enclose and improve a public square in the city of New York, even where the plaintiff had recovered in an action at law against the corporation, $3,056, for their delay in not performing the contract. In short, these cases show that there is no very ma-

terial difference between contracts to build and contracts to repair. There is a recognized and defined limit applicable to both. A claim to this species of relief may exist under either, and whether it will or will not be granted, depends usually, upon the circumstances of the particular case. The defendant, therefore, was not entitled to have the complaint dismissed upon the ground that it did not contain facts sufficient to constitute a cause of action.

The judge found that the building was not so destroyed by the fire as to be incapable of repair, and that four months was a reasonable time within which to make the repairs; but inasmuch as the building was very old, as it was no longer suited to the growth and increase of business in that locality; being. neither of the style, the strength nor of the size required for the business usually carried on there, he took into consideration that it would be a loss and injury to the defendant to compel him to restore the building to its former condition, in compliance with a covenant in a lease that had only about three years to run, and regarding the whole case as one addressed to. the equitable discretion of the court, he did not adjudge the specific performance of the covenant, but adjudged instead, that the defendant should pay to the plaintiffs the estimated excess of the value of the lease to them for the residue of the term, over the rent they were to pay, which he found to be $2,366 88; that is from the 1st of August, 1866, until the expiration of the extended term, after deducting the proportional rent from the 31st of March, 1866, the day of the fire, to the 17th of August of the same year. This amounted in fact to a rescission of the lease, whereby the defendant was relieved from the obligation of performing the covenant, and from all liability thereafter to any action at law thereon for the recovery of damages: whilst the plaintiffs were compensated by an award in damages for the loss and injury they sustained by the non-performance of the covenant.

The judge regarded the special circumstances as affording good reasons why the court should not, in the exercise of its equitable discretion, compel a specific performance. The provision of the fire law (Session Laws of 1866, vol. 2, p. 2009),.

in respect to building upon, raising, enlarging or altering an existing building; the extent to which the building had been destroyed by the fire, and the act of the owner of the adjoining building in taking down the party wall; made a repairing of the building, in compliance with the covenant, exceedingly onerous; but not impossible. It was manifestly to the defendant's interest that he should be relieved from the covenant, and be at liberty, like his brother, to erect a suitable building upon the premises. But he was not in equity entitled to it as a matter of right, the general rule in equity being that if the contract was just and fair at the time it was entered into, events subsequently occurring, and not so involved in it that they must have been present to the minds of the parties at the time of its execution, cannot be brought forward to show the hardship of enforcing it, or as excusing performance, unless these subsequent events are in some way due to the party who applies for the specific performance (see the cases collected in Fry on Specific Performance, ch. vi); but like all general rules it is subject to exceptions, and there are cases in which the court, as in the present case, took into consideration the hardship arising from the occurrence of subsequent events (*Webb* v. *The Direct, &c. Railway Co.* 9 Hare, 129; s. c. on appeal, 1 De Gex. M. & G. 521; *City of London* v. *Nash*, 3 Atk. 512; 1 Ves. Sr. 12; *Costigan* v. *Hastler*, 2 Sch. & Lef. 160).

But it does not follow, as the defendant insists, that if the court does not decree specific performance, it must dismiss the complaint, and is precluded from making what it considers a more equitable disposition of the subject-matter before it, for it is a familiar rule that if the jurisdiction in equity attaches in any case from the want of an adequate remedy at law, it shall, having rightfully attached, be made effectual for the purpose of complete relief (1 Story's Equity Jurisp. § 64, h, i, k). It attached in this case, because it was in the power of the court to decree the specific performance, as the repairing of the building was not impossible. The change made by the adjoining owner in the party wall, and the restrictions which are now imposed by statute in building upon an existing building, did not prevent the defendant from repairing the building, so

as to comply substantially with the covenant; for a covenant, as respects its future performance, when the condition or contingency arises which calls for its fulfillment, will be construed with reference to a public law or regulation enacted after the covenant was entered into, if the law or public regulation in any way affects it; for if a man covenants to do a thing which is lawful, and a subsequent statute hinder him from doing it, the statute repeals the covenant (Platt on Covenants, pp. 587, 588). The defendant could not, under the statute, raise the building as high within some eight or nine feet as it was before, and therefore the rebuilding of it to the height of fifty feet would, in consequence of the statute, be a sufficient compliance with the covenant (*Atkinson* v. *Ritchie*, 10 East, 530). What was required to be done, moreover, under the covenant, was sufficiently definite and certain. It was to restore the building to the condition in which it was before the fire, within the limit of fifty feet in height, as the fire laws required. It was certainly as definite as the cases previously referred to, before Lord Hardwicke, of the pulling down of an old house and the rebuilding of a new one, and the rebuilding of a house destroyed by fire (*Pembroke* v. *Thorpe*, 3 Swanst. 437, and *Rook* v. *Worth*, 1 Ves. Sr. 460).

If, as was held in *Bradley* v. *Aldrich* (40 N. Y. 504), there is no ground whatever for equitable relief, if the facts disclosed show, that there is a cause of action at law, but nothing calling for equitable interposition, the complaint must be dismissed, and the party left to pursue that remedy to which he should have resorted in the first instance, instead of coming into equity. Thus, in the case cited, the plaintiff brought a suit in equity to have a contract set aside on the ground of fraud, and asked that certain real estate which he had parted with under the contract should be ordered to be reconveyed to him; the court held that the plaintiff was not entitled to the relief asked, having failed to satisfy the court of the frauds alleged, except in respect to one false representation, for which he was entitled to a judgment for whatever damages he might, *in that respect alone*, have sustained, and a reference was ordered to ascertain the damages. It was held, that upon refusing the

equitable relief the court should have dismissed the complaint, as the plaintiffs' remedy for the recovery of damages was by an action at law, which being an action for the recovery of money only, is under the code to be tried by a jury, and therefore not a matter of equitable cognizance.

But in the present case the relief which the court gave could not be obtained in an action at law. In an action at law, damages could be recovered for a breach of the covenant to repair, but the court went much farther than this. It adapted to the special circumstances of the case the equitable relief which it considered appropriate. It relieved the defendant altogether from the strict performance of the covenant, so that instead of repairing, or rather of rebuilding upon the remains of the walls that were left, he might be enabled to erect such a structure as his interest as owner demanded. This relieving of a party from the strict performance of a contract, upon the ground that it would be hard or unreasonable to enforce it, is a very delicate branch of equitable jurisdiction, and is exercised only under strong or very peculiar circumstances (1 Story's Equity Jurisp. §§ 331, 694, 700, and the cases there cited). The judge regarded the circumstances of the case to be such as to warrant it, and the plaintiffs, who, upon the destruction of the building by fire, had nothing but this covenant, make no complaint at the defendant being relieved from the performance of it, or to the annulling of the lease, as the plaintiffs are, upon the equitable disposition which the court made of the whole matter, to receive an equivalent for the pecuniary loss they would otherwise sustain.

The defendant, it may be said, does not want the lease annulled, nor to pay the plaintiffs a pecuniary equivalent for the non-performance of the covenant. But the plaintiffs invoked the equitable aid of the court to compel a specific performance of the covenant, and the specific relief asked was denied, not upon the ground that the plaintiffs' case was devoid of equity, but because the court considered that a more equitable adjustment of the whole matter might be made in the way it devised. The relief given is strictly equitable. It is founded upon a due consideration of the consequences to the defendant of com-

pelling a specific performance and an equal consideration of the equitable rights, under the circumstances, of the plaintiffs. It is a case in which the same remedy could not be afforded at law. At law the defendant could sue for his rent, and the plaintiff for damages for the breach of the covenant; but this would not accomplish what has been effected by the equitable adjustment which has been made in this suit. The plaintiff came into court for the enforcement of an equitable right, a specific performance, which the court has not decreed, because having the whole matter before it, it could, in another way, adjust the equitable rights of both parties, and do what it is the especial province of a court of equity to do, so adjust the remedy as to make it effectual for the purpose of complete relief.

The right of a court of equity, where it refuses a decree for specific performance, either because the defendant, by a conveyance of the property to another party, or by some other act, has incapacitated himself from performing, or in view of the hardship of compelling performance, to give the plaintiff as an equivalent a pecuniary sum, to be ascertained by the application of some equitable and precise rule, or by directing an issue to ascertain the amount of the plaintiffs' damages, is a question upon which there has been such a diversity of opinion among judges, that the whole matter is involved in doubt and uncertainty. There is for the breach or non-performance of a contract a legal remedy by an action for the recovery of damages, and it being a fundamental rule that courts of equity will not interfere where the legal remedy is ample, it is very naturally assumed that if courts of equity cannot or will not compel the specific performance of a contract, they should not proceed to award damages for the non-performance of it, the plaintiff having an adequate remedy for the recovery of damages in an action at law.

There are, however, cases in which this jurisdiction to award pecuniary compensation in lieu of performance, can and ought to be exercised—in which the relief is in its nature equitable—and there is a well marked line to distinguish where a court of equity may and where it may not, upon refusing a

specific performance, substitute this pecuniary relief; but to ascertain, in the present confused state of the authorities, where this line is to be drawn, will require a careful examination of the adjudged cases.

In *Cleaton* v. *Levison* (Finch's R. 164), a case decided as early as 1674, the bill was to compel the execution of an agreement, and it was decreed that the defendant should execute the agreement in *specie*, as far as he was capable of doing so, and likewise satisfy the plaintiff for such damages as he had sustained in not enjoying the premises according to the agreement.

In *Hedges* v. *Everard* (1 Eq. Abr. 18, p. 7), in which a jointress sought to have satisfaction for a defect in the value of her jointure lands, which her husband had covenanted were of a certain value, the objection was taken that the remedy was in damages, which were determinable only at law; but it was said that a master in chancery may properly inquire into the value and defects of the lands, and report it to the court, which may decree that the defect be made good, or send the question to be tried at law upon a *quantum damnificatus*.

In ―――― v. *White*, reported in a note to *Newmarch* v. *Brandling* (3 Swanst. 108, note *a*), the court would not decree a specific performance; but as the report expresses it, "directed only a *quantum damnificavit*, by the defendants not taking the lease."

In *Cudd* v. *Rutter* (1 P. Wm. R. 570), it would appear from the more correct account of that decision, in Mr. Cox's note to the fourth edition of these reports, Lord Macclesfield reversed the decree of the Master of the Rolls, for the specific performance of a contract for the transfer of stock, and decreed instead, that the defendant should pay to the plaintiff the difference between the value of the stock on the day it was to be transferred and its value when the plaintiff brought his suit; which was decreeing to the plaintiff a compensation in lieu of specific performance, very nearly in the same way that Judge Brady did in the present case.

In *Colt* v. *Netterville* (2 P. Wm. 305), Lord King overruled a demurrer, stating that the case might at the hearing be attended with such circumstances as would make it just to decree

that the defendant should either transfer the stock according to his agreement, or *pay the difference.*

In the *City of London* v. *Nash* (3 Atk. 512), Lord Hardwicke refused a specific performance, saying, " The relief must be by way of inquiry of damages; I am more inclined to this than a specific performance ;" and he directed an issue to try what damages the plaintiff had sustained.

In *Denton* v. *Stewart* (1 Cox, 258 ; 17 Ves. 276, note *b*), the bill was for a specific performance, and it appearing upon the hearing that the defendant had incapacitated himself from performing, having assigned the lease during the suit, Lord Kenyon referred it to the master to inquire what damage the plaintiff had sustained, and decreed that the defendant should pay to the plaintiff such damage so to be ascertained, together with the costs of the suit.

So far, it may be said, upon the authority of these early cases, that a court of equity, where it cannot, or where it considers, in view of all the circumstances, that it ought not, to decree a specific performance, may, in lieu thereof, award an issue to ascertain the plaintiff's damages ; or, if it can do so, may fix the amount of the compensation by the application of some equitable rule or measure.

In *Clinan* v. *Cooke* (1 S. & L. 25), Lord Redesdale assented to the proposition of the defendant's counsel, that if the plaintiff had put it out of his power to execute a lease, relief must be sought at law, and could not be obtained in equity. This, as will more fully appear hereafter, was correct, the defendant having, before the commencement of the suit, executed a lease to another party, and there was, therefore, no ground for equitable interposition, the plaintiff's remedy being an action at law to recover damages for the breach of the agreement. Lord Redesdale nevertheless decreed that the money which the plaintiff had paid at the making of the agreement should be repaid to him by the defendant with interest.

Sir William Grant entertained some doubt in *Greenway* v. *Adams* (12 Ves. 401); but upon refusing the specific performance, he directed a reference to a master to ascertain the plaintiff's damages, upon the authority of Lord Kenyon's decis-

ion in *Denton* v. *Stewart* (*supra*), remarking that probably, if he had had the benefit of seeing the statement and the development of the principle upon which Lord Kenyon acted, he should be perfectly reconciled to it, and as the relief must consist purely of pecuniary compensation, he thought the master just as competent to decide that as a jury.

Afterwards, in *Blose* v. *Sutton* (3 Merv. 248), he said : " The competency of a court of equity to give damages for the non-performance of an agreement, notwithstanding the case of *Denton* v. *Stewart*, has been questioned by very high authority ; " and he points out as a discriminating feature in *Denton* v. *Stewart* that the defendant there had been guilty of a fraud in voluntarily disabling himself from performing the agreement.

In *Gwillim* v. *Stone* (14 Ves. 128), Sir William Grant refused to order an inquiry before the master to ascertain what compensation should be made to the plaintiff for the loss he had sustained from the defendant's failure to carry the contract into execution.   He referred to his former decision in *Greenway* v. *Adams*, where he had, he said, some doubt upon the principle ; but he distinguished the former case, which was for a specific performance, from the one then before him, where the bill was for the delivering up to the plaintiff of the contract for the purchase, on the ground of the defendant's defective title, and that compensation should be made to the plaintiff for the loss he had sustained.   He decreed the delivering up of the contract, but denied the reference to ascertain the plaintiff's damages, for the reason that the defendant's defective title was set up by the bill, and the plaintiff therefore knew when he brought the suit that the defendant could not perform the contract and that his proper and only remedy was an action at law to recover damages.   In *Hatch* v. *Cobb* (4 Johns. Ch. 560), Chancellor Kent, for the same reason (that the plaintiff knew when he filed his bill, that the contract could not be specifically performed), doubted the jurisdiction of the court in such a case to assess damages merely ; and Lord Cottenham, affirming the decision of the Master of the Rolls, in *Sainsbury* v. *Jones* (2 Beav. 464), on appeal (5 My. & Cr. 1), held expressly that there was no ground for equitable relief in such a case.   He said the plaintiff knew

when he filed his bill *that he could not compel a specific perform-ance*, and having sought compensation for damages in a court that had not jurisdiction to award them, the decree of the Master of the Rolls dismissing the bill was correct.

. In deciding this case, Lord Cottenham said: " I certainly recollect the time at which there was a floating idea in the pro-fession that this court might award compensation for the injury sustained by the non-performance of a contract, in the event of the primary relief for a specific performance failing, and I have formerly seen bills praying such relief ; but that arises from my having known the profession sufficiently long, to recollect the time when the decision of Lord Kenyon, in *Denton* v. *Stewart*, had not been formally overruled, but, at that time, very little weight was attached to it, and very few instances occurred in which the plaintiffs were advised to ask any such relief; and for a short time Sir W. Grant's decree in *Greenway* v. *Adams*, added something to the authority of *Denton* v. *Stewart, although* he threw out strong doubts as to the principle of that case. This, however, lasted but a short time, for *Greenway* v. *Adams* occurring in 1806, Lord Eldon, in 1810, in *Todd* v. *Gee* (17 Ves. 273), expressly overruled *Denton* v. *Stewart ;* and from that time there has not, I believe, been any doubt upon the subject. Certainly, during the thirty years which have elapsed since that time, I have never supposed the granting of any such relief as being within the jurisdiction of this court."

This is a very strong statement, and by an able equity judge, and yet it is found that equitable tribunals, both before and since, have thought and ruled differently. Lord Eldon, in the case referred to by Lord Cottenham (*Todd* v. *Gee, supra*), did not overrule *Denton* v. *Stewart*, although he questioned and qualified it. He said, " I should be inclined to support the *whole* course of previous authority against *Denton* v. *Stewart,* not being aware that this court would give relief in the shape of damages, which is very different from giving compensation out of the purchase money." As regards this remark about "the *whole course of previous authority*," it is sufficient to state, that the prior cases which I have cited show that, in this re-spect, Lord Eldon was mistaken. He said further, " My opinion

is that this court ought not, *except under very particular circumstances*, as there may be upon a bill for a specific performance of a contract, to direct an issue, or a reference to the master," which is admitting that there may be cases in which the jurisdiction can be exercised. And he finally says, "In *Denton* v. *Stewart*, the defendant *had it in his power to perform the agreement* and *put it out of his power during the suit*. The case, if it is not to be supported upon *that distinction*, is not according to the true principles of the court," which was a recognition to a certain extent of the general ground upon which this jurisdiction rests.

Chancellor Kent, in *Phillips* v. *Thompson* (1 Johns. Ch. 150), instead of dismissing the bill for the specific performance, retained the case and ordered an issue of *quantum damnificatus*, and in *Parkhurst* v. *Van Cortland* (Id. 273), which was a bill for the specific performance of a contract to sell land, he refused the specific performance, but decreed compensation, referring it to the master to ascertain the amount in the mode pointed out by the court. He afterwards, however, in *Hatch* v. *Cobb* (4 Johns. Ch. 560), had doubts respecting the extent of the jurisdiction. He thought that in very special cases equity might possibly sustain a bill for damages on a breach of contract; but that it was not the ordinary jurisdiction of the court. In that case the defendant had disabled himself from being subjected to a decree for a specific performance by parting with his interest before the suit was brought, and the chancellor said that if he had not parted with his interest it might even then be a point deserving of consideration, whether the plaintiff was entitled to assistance. In the subsequent case of *Kempshall* v. *Stone* (5 Johns. Ch. 193), he again declared that the court ought not, except in very special cases, to sustain a bill merely for the assessment of damages, saying that the more he reflected upon the subject, the more strongly he inclined to that opinion. He referred to Lord Eldon's remarks in *Todd* v. *Gee* (17 Ves. 273), and was evidently strongly impressed by Lord Eldon's erroneous statement that the whole previous course of authority was against the exercise of the jurisdiction. Whatever doubt may have arisen from this expression of opinion on the part of Chancellor Kent, it was, at

least in this State, set at rest by the subsequent decision of the Court of Errors, in *Woodcock* v. *Bennett* (1 Cow. 711), in which it was held that the usual decree was either a specific performance, or an issue to ascertain the damages; but that when a party had put it out of his power to perform, the court might retain the bill and refer it to a master to assess the damages. In the Supreme Court of the United States, in *Pratt* v. *Law* (9 Cranch, 494), it was held that it is not consistent with the equity practice to order an issue to ascertain the damages in any case in which the court can lay hold of a simple, equitable, and precise rule to ascertain the amount which it ought to decree; and in *Forrest* v. *Forrest* (4 Ves. 497), where the master reported that for the breach of the agreement the money received should be paid back with interest, Lord Alvanley said he did not know how a jury could adopt a better rule.

In *Kendall* v. *Beckett* (2 R. & My. 88), which was a suit for a specific performance, the plaintiff failed to show that the transaction had been on his part in all respects fair (the weight of evidence tending to prove that the price had been inadequate), and the court held that he had altogether failed in making out a case for equitable interposition. The bill prayed, that in the event of the court's refusing a specific performance, it would decree the repayment of the sum deposited at the making of the contract. Lord Brougham refused to do so, " especially," as he said, " in favor of a party whose conduct was tainted with unconscientious dealing." He further remarked, that " even under circumstances entitled to favor, the jurisdiction was, at best, extremely doubtful," referring to what was said by Lord Eldon, in the case before cited, of *Todd* v. *Gee*, as showing that it could not be exercised, except in a very special case.

In *Jenkins* v. *Parkinson* (2 My. & K. 12, 13), Lord Brougham said Lord Eldon did not, in express terms, overrule *Denton* v. *Stewart*, but he did everything short of denying it to be law, and then after some remarks distinguishable for their inaccuracy in the statement of what occurred in the particular cases referred to, he very confidently disposes of *Denton* v. *Stewart*, and Sir Wm. Grant's ruling, in *Greenway* v. *Adams*,

as follows: "The current of *all the previous authority* against it (*Denton* v. *Stewart*), to which Lord Eldon refers in *Todd* v. *Gee*, may therefore be considered as *restored*, after a *temporary and dubious interruption*, and it may now be affirmed that these two cases (*Denton* v. *Stewart* and *Greenway* v. *Adams*) are no longer law;" a summary disposition of the question, which certainly justifies Lord Campbell's remark, that Lord Brougham was a novice in the Court of Chancery (Lives of the Chancellors, vol. 8, p. 421). In *Williams* v. *Edwards* (2 Sim. 78), the contract having become void by its own conditions, the bill for the specific performance was dismissed, and the vice-chancellor refused to order the repayment of the deposit to the plaintiff, upon the more satisfactory reason, that there was not, from the beginning, any ground for equitable interference, as an action at law lay to recover back the money deposited, the contract, by its own condition, never having gone into effect.

In *Andrews* v. *Brown*, 3 Cush. (57 Mass.) 135, the question of this jurisdiction was very fully discussed, and the conclusion arrived at by the court was that the decision of Lord Kenyon in *Denton* v. *Stewart* was reasonable, and conformable to the principles of equity. That it did not make any material difference whether the property was conveyed by the defendant during or before the commencement of the suit, provided the plaintiff was not aware, when he filed his bill for relief in equity, that the defendant had conveyed the property to another, and even in such a case that there might be equitable jurisdiction if the purchaser knew of the existence of the agreement with the plaintiff, and was made a party to the suit; and in the following American cases the jurisdiction was either recognized or exercised (*Oliver* v. *Crosswell*, 42 Ill. 41; *Bell* v. *Thompson*, 34 Ala. 633; *Stockton* v. *The Union Oil Co*. 4 West Va. 273; *Barlow* v. *Scott*, 24 N. Y. 40).

In *Prothero* v. *Phelps* (25 L. J. Ch. 105), Lord Justice Turner said, "That it is competent to this court to ascertain damages, I feel no doubt. It is the constant course of the court in the case of vendor and purchaser, where a sufficient case is made for the purpose, to make an inquiry as to the deterioration of the estate, and in so doing, the court is, in

truth, giving damages to the purchaser for the loss sustained by the contract not having been literally performed;" and Mr. Fry, in his treatise, pertinently observes, "It is impossible not to see the great propriety of courts of equity being clothed with such a jurisdiction, so that in cases coming before them by way of specific performance, complete justice may be done to the suitors without their resorting to any other forum" (Fry on Specific Performance, 346).

It may be stated, as the result of this review, that if there was no ground whatever for equitable interposition when the suit was brought, as where the plaintiff knew, when he brought it, that the defendant could not perform (either from having conveyed the property to another, or from any other cause), the complaint is to be dismissed, the plaintiff having no right to come into a court of equity to get a pecuniary compensation for the injury he has sustained, as he has a full and adequate remedy for obtaining it by an action at law. In such a case it is not only the appropriate, but it is the sole, remedy, for in the common-law action for the recovery of damages, the defendant has a right to a trial by jury, and this cannot be taken away by bringing a suit in equity to obtain what the party can obtain by an action at law. But where it appears affirmatively by the plaintiff's complaint or bill that the contract is just and fair—that it is one which the defendant ought to and can perform—then the jurisdiction in equity attaches; the defendant is put to his answer, the case comes before the court upon the issue and the proofs for its equitable consideration, and it may decree a specific performance, or, in lieu of performance, award to the plaintiff a compensation in money, to be ascertained by some equitable rule, or by a trial by jury, unless a trial by jury is waived (*Barlow* v. *Scott*, 24 N. Y. 45, 46), or it may, on the merits, dismiss the complaint altogether.

The exercise of this jurisdiction, where there is anything upon the face of the complaint, or in the proofs, that calls for an equitable determination, is no violation of the right of a trial by jury, for the power to compel the specific performance of agreements is as old as the Court of Chancery; bills filed for that specific relief being amongst the earliest records of the

court (Spence, vol. 1, 645; Call. 11, 2); the power to afford equitable relief, where the ordinary judges in courts were incapable, having been exercised long before Magna Charta; first by the council that attended the king's person, and afterwards by the chancellor, whose office and equitable jurisdiction is traceable as far back as the reign of Edward III (Spelmans' Glossary, fols. 106, 107; Madox, c. 11, xix; Vaughan Rev. 320; c. vi; Spence, B. P. 2, B. 1, c. 1, 2, 3; *Martin* v. *Marshall*, Hob. 63). Indeed, Coke says that in the reign of Edward IV, all the judges of England declared that the three common-law courts and the Court of Chancery were " all the king's courts, and have been time out of memory of man, so as no man knoweth which is the most antient " (8 Co. Præf.). Whenever, therefore, the jurisdiction in equity attaches, the right to administer any form of equitable relief which the circumstances of the case calls for, follows as incident to the jurisdiction, though it may ultimately be, in whole or in part, the awarding of damages as a substitute for the equitable relief sought as an equivalent, or by way of compensation for the injury or wrong sustained.

The judgment should be affirmed.

Judgment affirmed.